**WILMERHALE**

James W. Prendergast

+1 617 526 6181 (t)
+1 617 526 5000 (f)
james.prendergast@wilmerhale.com

October 21, 2015

**BY ECF**

Judge Naomi Reice Buchwald
U.S. District Court for the Southern District of New York
500 Pearl Street
New York, NY 10007

      Re: *In re Intercept Pharm., Inc. Sec. Litig.*, No. 14 Civ. 1123

Dear Judge Buchwald,

      We are counsel for Defendants Intercept Pharmaceuticals, Inc., Mark Pruzanski, and David Shapiro (collectively, "Intercept") in the above-captioned securities fraud action. As directed by the Court during its September 24, 2015 telephonic conference with the parties, we write to request leave to file a 5-page surreply and a short expert affidavit to respond to Plaintiffs' October 14, 2015 Reply submissions in support of their motion for class certification.

      After taking the deposition of Intercept's expert, Dr. Paul Gompers, Plaintiffs submitted their Reply, together with a further 38 pages of additional expert opinion from Dr. Steven P. Feinstein ("Feinstein's Reply Report" or "Feinstein Reb."). Plaintiffs' Reply submissions are replete with new evidence and new theories offered to prove market efficiency that were not previously submitted in Plaintiffs' initial brief or in Dr. Feinstein's original 41 pages of expert opinion. Saving such expert opinion for reply "effectively deprives [Intercept] of an opportunity to meaningfully respond." *See Bennett v. Sprint Nextel Corp.*, No. 09-2122-EFM, 2013 WL 1197124, at *2 (D. Kan. Mar. 25, 2013) (granting right to file surreply and rejecting characterization of expert opinion regarding market efficiency offered in reply as mere rebuttal opinion that could not have been created before plaintiffs reviewed defendants' expert report).[1]

      In particular, Defendants seek solely to address: (1) new evidence and theories submitted on reply; (2) new tests or test results reported in the Reply submissions that are either

---

[1] Although Plaintiffs' submission of new evidence on reply presents grounds for a motion to strike, Defendants request a surreply in lieu of moving to strike. *See In re Elec. Books Antitrust Litig.*, No. 11 MD 2293, 2014 WL 1282293 (DLC), at *8 (S.D.N.Y. Mar. 28, 2014) (at class certification, granting motion to strike portions of expert report submitted on surreply that provided "new analysis" that went "well beyond the scope of [the movant's expert's] addition of a finer grained analysis" in his reply report).

Wilmer Cutler Pickering Hale and Dorr LLP, 1875 Pennsylvania Avenue NW, Washington, DC 20006

Beijing    Berlin    Boston    Brussels    Denver    Frankfurt    London    Los Angeles    New York    Oxford    Palo Alto    Waltham    Washington

**WilmerHale**

October 21, 2015
Page 2

inapplicable or misstated; and (3) numerous characterizations of testimony of Defendants' expert taken out of context and in a misleading manner.[2]

Plaintiffs do not dispute that Intercept stock took at least two days fully to absorb "new" news. Therefore, as the competing expert submissions in this case make clear, whether Plaintiffs have proven market efficiency turns primarily on this Court's view of the Plaintiff's expert's use of a two-day event period to measure whether "new" news was fully and rapidly absorbed into the price of Intercept's stock – despite express recognition in this district that in an efficient market "share prices effectively incorporate new information *within hours of the announcement* of that information." *In re IPO Sec. Litig.*, 260 F.R.D. 81, 102 (S.D.N.Y. 2009) (emphasis added); *see also In re Parmalat Sec. Litig.*, No. 04 MD 1653 (LAK), 2008 WL 3895539, at *9 (S.D.N.Y. Aug. 21, 2008) (holding market efficient where reactions to unexpected news were "swift" and absorbed within "*one full day* of trading" (emphasis added)).

In their opening submissions, Plaintiffs and Dr. Feinstein defined an efficient market as: "a market in which available information is ***rapidly incorporated*** into the price of a security ***such that the trading price reflects all available information***." (Feinstein Decl. ¶ 34 (emphasis added)). On reply, however, Dr. Feinstein contends that stock price movement that ***begins*** quickly after the release of new news is itself sufficient evidence of market efficiency. (Feinstein Reb. ¶¶ 18, 51; *see also* Reply at 4-5). He also concludes for the first time, without citing any authority, that "economists do ***not*** expect that any news event would necessarily lead to the ***full***, instantaneous incorporation of new news in a stock price." (Feinstein Reb. ¶ 34 (second emphasis added)).[3]

Dr. Feinstein also advances new justifications to support his use of a two-day window. Among other new theories, he now explains, based on authorities he did not cite in his prior declaration, that "[n]umerous factors will affect the speed at which new information is incorporated into a stock's price," purportedly including, among others, the "nature and importance of the announcements," the "manner in which they were made," whether the information is "surprising and complex," whether "the valuation impact is easily understood," "contemporaneous commentary," and "confounding discovery." (Feinstein Reb. ¶¶ 32-34, 38; Reply at 6-7). Plaintiffs and Dr. Feinstein now assert that the "magnitude of the news" on January 9 "would reasonably [have] elicit[ed] a more protracted and continuing impact on the stock price" and "warrants measuring Intercept's stock price reaction over the two-day window." (Feinstein Reb. ¶ 55; Reply at 7). He also contends that analyst reports released between January

---

[2] *See also Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.*, 687 F. Supp. 2d 381, 387 (S.D.N.Y. 2010) (allowing surreply where evidentiary information submitted for first time with reply); *Pagan v. Abbot Labs, Inc.*, 287 F.R.D. 139, 143-44 (E.D.N.Y. 2012) (allowing surreply to respond to new evidence submitted in class certification reply).

[3] Dr. Feinstein also attempts to redefine the event selection criteria he used in his event study more broadly as "product development news" (Feinstein Reb. ¶ 22) rather than "information related to the allegations in the Complaint." (Feinstein Decl. ¶ 94).

WILMERHALE

October 21, 2015
Page 3


12-14, 2014 "trying to downplay the impact of the disclosures" justifies a two-day window. (Feinstein Reb. ¶ 60). Dr. Feinstein could have addressed all of this and any of the other alleged factors that he now claims could cause a "protracted and continuing" price impact in his initial report. (Feinstein Reb. ¶¶ 55, 59-60). But he did not.[4]

Finally, a surreply is also necessary to place Dr. Gompers's deposition testimony, from which Plaintiffs selectively quote, in proper context. As an example, Dr. Feinstein claims that "Dr. Gompers concedes that [Dr. Feinstein's] event selection methodology is objective" (Feinstein Reb. ¶ 26) when Dr. Gompers actually testified that "it is objective but has hindsight basis, which makes it inappropriate." (Gompers Dep. 194:15-18).[5]

Defendants ask for leave to file a 5-page surreply and a short expert affidavit two weeks after the date upon which leave is granted. Defendants also respectfully renew their request for oral argument concerning class certification and are prepared to offer expert testimony as well, if this Court determines an evidentiary hearing would assist the Court.


Respectfully,

*/s/ James Prendergast*

James W. Prendergast


cc: Tor Gronborg, Esq.

---

[4] Dr. Feinstein's initial report contained the following conclusory statement unsupported by any explanation or authority: "Given the nature and importance of the disclosures, and the manner in which the disclosures were made and disseminated to investors, as well as contemporaneous commentary regarding Intercept's stock price movements, the use of two-day event periods is particularly appropriate in this case." (Feinstein Decl. ¶ 97).

[5] Furthermore, Dr. Feinstein asserts that upon purportedly re-running Dr. Gompers's Goldfeld-Quant test, used by Dr. Gompers to test for a significant increase in the volatility of Intercept's stock returns, "the statistical significance that Dr. Gompers found [in certain stale news days] disappears." (Feinstein Reb. ¶ 49). This is not the case, and Dr. Gompers is prepared to explain how Dr. Feinstein's adjustment also reveals statistical significance and does not undermine Dr. Gompers' analysis.